UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRETT KERR NORRIS,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of the Social Security Administration,

    Defendant.

Case No. C10-1855-MJP-BAT

**REPORT AND RECOMMENDATION**

Brett Kerr Norris seeks review of the denial of his Supplemental Security Income and Disability Insurance Benefits applications. He contends that the ALJ erred by (1) failing to properly weigh the medical evidence and (2) failing to give proper weight to the lay witness testimony of Mr. Norris' mother, Brenda Kerr Mino. Dkt. 15 at 2. As discussed below, the Court recommends the case be **REVERSED** and **REMANDED** for additional proceedings.

**INTRODUCTION**

Mr. Norris is currently 46 years old and has a history of bipolar disorder. He completed approximately two years of college, and has worked as a computer support technician, data entry clerk, and auto lot attendant.[1] Mr. Norris has not worked since a 2005 suicide attempt, excepting

---

[1] Tr. 29, 122, 175, 433, 562, 566.

REPORT AND RECOMMENDATION - 1

a three week period in 2007.[2]

In March 2008, Mr. Norris applied for benefits, alleging disability beginning January 1, 2004; he later amended this alleged onset date to February 23, 2005, the date of his most recent suicide attempt.[3] His applications were denied initially and upon reconsideration. Tr. 44, 53. The ALJ conducted a hearing on February 5, 2010, and on April 20, 2010, the ALJ issued a decision finding Mr. Norris not disabled.[4] The Appeals Council denied Mr. Norris' request for review, making the ALJ's decision the Commissioner's final decision. Tr. 6-8.

## THE ALJ'S DECISION

Utilizing the five-step disability evaluation process,[5] the ALJ made the following findings:

**Step one:** Mr. Norris had not worked since February 23, 2005.

**Step two:** Mr. Norris had the following severe impairment: bipolar disorder.

**Step three:** This impairment did not meet or equal the requirements of a listed impairment.[6]

**Residual Functional Capacity:** Mr. Norris could perform a full range of work at all exertional levels but with certain nonexertional limitations. He could do work that needs little or no judgment and could perform simple duties that can be learned on the job in a short period. He would have an average ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. He could have occasional interactions with coworkers and supervisors but not in a cooperative or team effort. Although he could not deal frequently with the general public, incidental contacts were permissible.

**Step four:** Mr. Norris could not perform his past work.

**Step five:** As there were jobs Mr. Norris could perform, he was not disabled.[7]

---

[2] Tr. 423-24, 33.
[3] Tr. 101A-103, 169, 565.
[4] Tr. 557-604; 14-30.
[5] 20 C.F.R. §§ 404.1520, 416.920.
[6] 20 C.F.R. Part 404, Subpart P. Appendix 1.
[7] Tr. 19-29.

REPORT AND RECOMMENDATION - 2

## DISCUSSION

**A.  Evaluation of the Medical Evidence**

Mr. Norris contends the ALJ erred in discounting the opinion of treating psychiatrist Donald J. Grubb, M.D., and evaluating the other medical evidence.  Mr. Norris also contends that the ALJ therefore failed to account for all of his mental limitations in assessing his residual functional capacity (RFC).  Dkt. 15.  The Court agrees.

### 1.  Treating Psychiatrist Dr. Donald J. Grubb

An ALJ may not reject a treating doctor's opinion, even if controverted by another doctor, unless the ALJ sets forth specific, legitimate reasons for rejecting it that are supported by substantial evidence in the record.  *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010).

Dr. Grubb diagnosed Mr. Norris with Bipolar Disorder and treated him for a period of twelve years.  Tr. 420, 388.  Dr. Grubb's records show that Mr. Norris' bipolar disorder is a severe, chronic condition requiring regular treatment.  Tr. 375, 390.  Consistent with the nature of bipolar disorder, Dr. Grubb's treatment records show significant swings in Mr. Norris' functioning.  Tr. 375, 380.  During periods when Mr. Norris experiences down-cycles, he has a history of becoming psychotic, suicidal, and needing in-patient hospitalization.  Tr. 383-84, 387, 390, 395.  Although the severity of Mr. Norris' episodes have decreased over time, his overall global functioning has declined.  Tr. 375.  Dr. Grubb noted that Mr. Norris' overall functioning was "hampered by very chronic depression and pervasive anxiety, resulting in social withdrawal and an inability to persist in activities related to employment."  Tr. 420.  Because Mr. Norris' functional level is unpredictable, Dr. Grubb also noted that Mr. Norris required the help of his family to provide lodging and other financial support.  Tr. 375, 396.  Dr. Grubb further opined

that Mr. Norris' mental illness has had lasting effects on his cognitive abilities, and consequently Mr. Norris has never been able to take on a full-time job or a job with insurance benefits. Tr. 375.

On July 17, 2007, Dr. Grubb prepared an opinion letter just after Mr. Norris suffered an episode of quasi-psychotic thinking and depression on July 12, 2007, following a "loss of work." *Id.* He opined that Mr. Norris' Bipolar Disorder has a debilitating effect on his overall level of psychosocial functioning. Tr. 376. Ultimately, Dr. Grubb concluded that Mr. Norris was "not able to pursue or retain meaningful employment and should be granted disability to provide a basic level of medical and economic support." *Id.*

The ALJ gave little weight to Dr. Grubb's July 2007 opinion letter on the grounds that (1) Dr. Grubb's opinion did not reflect the severity of Mr. Norris' bipolar disorder because the impairment did not satisfy the 12-month durational requirement; (2) there were "gaps" in Dr. Grubb's treatment of Mr. Norris; and (3) Dr. Grubb's opinion was inconsistent with the totality of medical evidence. Tr. 27. As set forth below, substantial evidence does not support these reasons.

### a. Durational Requirement

The ALJ rejected Dr. Grubb's opinion because he found that 1) Mr. Norris' inability to work did not satisfy the durational requirement of 42 U.S.C. § 423 (d)(1)(A) and 2) Mr. Norris experienced good periods during which he did not require treatment. Both of these rationales are based upon an incomplete review of the medical record and thus are not legitimate reasons to reject Dr. Grubb's opinion.

The ALJ first rejected Dr. Grubb's opinions because "the evidence of record does not establish that the claimant has had a 12-month period of disability and further reveals long

periods of time during which the claimant's symptoms have not been of such severity to require regular treatment." Tr. 25, 27. The medical record shows that Mr. Norris' bad periods do not last for a continuous period of 12 months (i.e., every day for 12 months). Based on this, the ALJ gave little weight to Dr. Grubb's opinion that Mr. Norris was "not able to pursue or retain meaningful employment" because Mr. Norris' periods of limitation did not last for a continuous period of twelve months. *Id.* The ALJ's rationale is based on the 12-month durational requirement set forth in 42 U.S.C. § 423(d)(1)(A). Under that section, the term "disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or which can be expected to last for a continuous period of not less than 12 months." The ALJ's rationale for rejecting Dr. Grubb's opinions is supported by a reasonable interpretation of the statute. *See Barnhart v. Walton*, 535 U.S. 212, 219 (2002) (holding that although the statute is silent as to the durational requirement for a claimant's "inability" to work, it can be fairly inferred that the impairment must also be *that severe* so as to preclude work for 12 months).

However, the ALJ's determination that Mr. Norris did not satisfy the durational requirement was based upon an inaccurate assessment of the medical record. The record shows that Dr. Grubb has treated Mr. Norris for Bipolar Disorder for 12 years. As the ALJ acknowledged, the record indicates that Mr. Norris' treatment visits with Dr. Grubb reflect periods of symptom exacerbation followed by periods of remission. Tr. 25. But during the entire 12 years that Dr. Grubb has treated Mr. Norris, he has never been completely symptom-free. Dr. Grubb took into account Mr. Norris' functional level give both his good periods and his bad periods. Tr. 375, 420. The ALJ did not and thus failed to take into account that Mr. Norris'

recurrent and unpredictable down-cycles, while not lasting 12 months in duration, could limit his ability to maintain gainful employment. Moreover, the ALJ also did not take into account Dr. Grubb's treatment records, which indicated that Mr. Norris' overall functioning was impaired even during periods when he was symptom-free. Tr. 420. Thus, the ALJ's rejection of Dr. Grubb's opinion based upon the durational requirement of § 423(d)(1)(A) is not supported by substantial evidence.

In addition, the ALJ also discounted Dr. Grubb's opinions because Mr. Norris has "long periods of time during which the claimant's symptoms have not been of such severity to require regular treatment." Tr. 25, 27. Based upon this view of the medical evidence, the ALJ found that the "totality of the evidence of record [did] not support the level of impairment opined." Tr. 27. The record does not support this conclusion. As noted above, Mr. Norris experiences good and bad periods as a result of his Bipolar Disorder. The ALJ's evaluation of Dr. Grubb's records and the other medical evidence focused almost entirely on Mr. Norris' functioning during his good periods. An ALJ, however, cannot selectively focus on certain aspects of the medical evidence which tend to suggest non-disability and disregard the remainder of the medical evidence. *See e.g,. Winans v. Bowen*, 853 F.2d 643 (9th Cir. 1987) (finding that the ALJ's selective crediting of certain examining physicians' opinions was not supported by substantial evidence). By omitting the bad periods, the ALJ naturally concluded that Mr. Norris was not as limited as Dr. Grubb opined. Tr. 27. Hence, the ALJ erroneously relied only on certain parts of the record rather than the "totality of the evidence" in rejecting Dr. Grubb's opinions.

Accordingly, the Court concludes that the ALJ failed to provide legitimate reasons supported by substantial evidence to reject Dr. Grubb's opinions and thus erred.

### b. Gaps in Treatment

The ALJ also gave little weight to Dr. Grubb's opinions due to "gaps" in Mr. Norris' treatment. Tr. 24-25. An unexplained failure to seek medical treatment may be the basis for an adverse credibility finding unless a claimant can provide an acceptable reason for not seeking treatment. *See Orn v. Astrue,* 495 F.3d 625, 638 (9th Cir. 2007). The ALJ found that the existence of treatment "gaps" was inconsistent with the severity of Mr. Norris' impairment as opined by Dr. Grubb. However, the record does not support the ALJ's findings.

First, a claimant's inability to obtain treatment for lack of funds is not a legitimate reason to reject testimony. *Id.* The ALJ failed to consider that Mr. Norris did not have medical insurance and was experiencing financial difficulties during the treatment gaps in 2005 and 2006.[8] The ALJ thus erred in rejecting Dr. Grubb's opinion for treatment "gaps" when Mr. Norris in fact had a valid explanation.

Second, the record does not show that Mr. Norris' longstanding treatment relationship with Dr. Grubb is filled with gaps. This is not a case where over the last 12 years, Dr. Grubb had treated Mr. Norris infrequently or sporadically. Rather, Dr. Grubb saw Mr. Norris consistently for a lengthy period of time, and formed his medical opinion of the severity of Mr. Norris' limitations on this basis. Tr. 375. However, rather than consider this lengthy course of treatment, the ALJ focused only on "gaps" in treatment between March 2005 and August 2005, February 2006 and May 2006, and a seven-month period in 2007-2008. Tr. 24. These gaps, none of which lasted longer than seven months, do not take into account Dr. Grubb's long-term treatment of Mr. Norris. Duration of treatment is especially crucial to evaluating a mental impairment such as Bipolar Disorder, which is characterized by intense symptomatic periods

---
[8] Tr. 288, 296, 304, 375.

over a course of time. *See Orn*, 495 F.3d at 633 (considering that the nature and extent of a physician's relationship adds significant weight to his or her opinion). The ALJ erred in disregarding this consistent, long-term relationship and instead focusing only on the gaps between treatment visits. Thus, the ALJ's discounting of Dr. Grubb's opinion due to Mr. Norris' gaps in treatment was not supported by substantial evidence.

### c. Inconsistencies with Other Medical Evidence

The ALJ also gave little weight to Dr. Grubb's opinion because he found it inconsistent with other medical evidence. Tr. 27. Specifically, the ALJ found Dr. Grubb's opinion to be inconsistent with the opinions of Nurse Kathryn J. Draper, Dr. Magelssen, and Dr. Mee. *Id.* The record does not support this finding. Although the ALJ recognized Mr. Norris' limitations in some respects, he selectively focused only on testimonial evidence of his mental "upswings" and disregarded evidence of Mr. Norris' "downswings." *See* Tr. 20-28. He also ignored or discounted the opinions of Cathryn McRuer-Wong, M.A., M.H.P., and Michele White, L.M.H.C., both of which are consistent with that of Dr. Grubb.

First, the ALJ focused his analysis on Nurse Draper's observations during the symptom-free periods in Mr. Norris' mental cycle and disregarded the evidence showing the debilitating effects of his symptomatic episodes. The ALJ noted that in June of 2008, Mr. Norris told Nurse Draper that he was reconnecting with old friends, socializing on Facebook, and had two friends that he saw every month. Tr. 21. Although Nurse Draper gave no opinions about Mr. Norris' level of social functioning, the ALJ concluded that Nurse Draper's statements showed he had "moderate difficulties" in social functioning. However, Mr. Norris testified at his hearing that these activities were extremely limited. He stated that he only commented on other people's statuses on Facebook but never posted comments, that he rarely ever chatted on Skype, and that

REPORT AND RECOMMENDATION - 8

he saw friends only every couple of months. Tr. 20, 563, 572. Additionally, the ALJ did not consider Nurse Draper's statements that Mr. Norris was "telling trusted friends finally about his bipolar disorder and how it interferes with his working. He can't keep jobs because he becomes very depressed or manic with job stress." Tr. 510.

The ALJ also noted that Ms. Draper opined that Mr. Norris was "doing well on his current medical regime," and "that his sleep was good, affect spontaneous, and that things were going well." Tr. 25. However, the ALJ failed to note Ms. Draper's observations that he was "unable to work, living with parents, and socially isolated." Tr. 518. Such conclusions are not inconsistent with those of Dr. Grubb.

Furthermore, the ALJ noted that in Mr. Norris' January 6, 2010 appointment with Nurse Draper, she indicated that he had discussed the "secondary gain he gets from his mental illness" with his therapist at a previous appointment. Tr. 22. The ALJ used this fact in support of his conclusions that Mr. Norris' alleged limitations were more of convenience than necessity and that he had not worked for reasons unrelated to his mental impairment. Tr. 22, 26. Yet, the ALJ did not provide any reasons as to why negative inferences should be drawn from a mentioning of "secondary gain." Taken in context, Nurse Draper's clinical entry notes read, "He said he was stressed out by Christmas . . . His last appt with his therapist 12/2 focused on the secondary gain he gets from his mental illness and helping him focus on being a productive person. His symptoms started shortly after." Tr. 502. These observations do not indicate improper motives by Mr. Norris to exploit his alleged disability to receive financial "secondary gain," as the ALJ appears to have concluded. Rather, Nurse Draper's observations are consistent with those of Dr. Grubb indicating that Mr. Norris had repeatedly tried—and failed—to "get an ideal job that would not be too stressful." Tr. 26. When coupled with Mr. Norris' focus on being a

REPORT AND RECOMMENDATION - 9

"productive person," the reference to "secondary gain" indicates Mr. Norris' need to reinforce positivity when coping with his mental illness. Thus, the ALJ's evaluation of Nurse Draper's observations was improper because he selectively weighed her opinion of Mr. Norris' symptom-free periods against that of treating physician Dr. Grubb.

Second, the ALJ misinterpreted Dr. Magelssen's opinions as inconsistent with those of Dr. Grubb. Dr. Magelssen opined that Mr. Norris could engage in activities such as cooking, cleaning, performing personal care, surfing the internet, reading the paper, and shopping for food when he is not anxious. Tr. 20. The ALJ appeared to place great emphasis on Dr. Magelssen's observations that Mr. Norris could recall three words immediately and after a five-minute delay, was "slow but accurate" with serial sevens, spelled the word 'world' correctly both forward and backward, and repeated 8 digits forward and 5 backward. Tr. 21, 25 (referencing Tr. 434). However, none of these observations indicate Mr. Norris' has the ability to concentrate for prolonged periods, nor do they account for the debilitating down-cycles that are the basis for his disability claim. Indeed, the ALJ did not discuss Dr. Magelssen's observations that Mr. Norris "stopped working because he got too overwhelmed" and that he "stopped self-employment in May 2006 because it was too stressful." Tr. 433. It is also noteworthy that Dr. Magelssen observed that Mr. Norris "has little insight into his problems. While quite articulate, in many respects he was strikingly un-insightful about making any connections between his mood and feelings being related to anything happening around him." *Id.* These observations are consistent with Dr. Grubb's depiction of Mr. Norris as an individual who is largely intelligent in some respects but whose mental limitations inhibit his consistent, stable functioning.

Third, the ALJ did not give specific and legitimate reasons for weighing the opinion of Dr. Mee, a State agency non-examining consultant, over that of Dr. Grubb. The ALJ rejected Dr.

Grubb's opinion in favor of Dr. Mee's. Tr. 27. Dr. Mee opined that Mr. Norris had mild difficulties in concentration, persistence, and pace, that he could complete a normal workday and workweek, and that he could perform at a consistent pace without an unreasonable number of rest periods. Tr. 27. The ALJ provided no reasons for giving substantial weight to this opinion. Tr. 27. This is not a case where the ALJ has supported his conclusion on independent clinical findings considered by a non-treating physician. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). Dr. Mee based his conclusions in part on the opinion of Dr. Grubb, who opined that Mr. Norris was "unable to sustain employment" because his "overall functioning was hampered by chronic depression and pervasive anxiety." Tr. 447. Dr. Mee rejected Dr. Grubb's opinion merely because he found it to be "not supported with any evidence." *Id.* Without more, the weight given to Dr. Mee's opinion is not supported by substantial evidence.

Furthermore, the ALJ gave little weight to the opinions of Ms. McRuer-Wong, M.A., M.H.P., and Ms. Michele D. White, L.M.H.C. who are "other sources" that expressed conclusions consistent with those of Dr. Grubb. Tr. 27. An ALJ may consider both "acceptable medical sources" and "other sources" in evaluating the severity of an impairment and its effect on a claimant's ability to work. *See* 20 C.F.R. § 416.913; *Jager v. Barnhart,* 192 Fed.Appx. 589, 591 (9th Cir. 2006) (finding that the ALJ erred in according no weight to a mental health therapist, who was an "other source" capable of speaking the effects of the impairment on claimant's ability to work). Ms. McRuer-Wong opined that Mr. Norris' "symptoms of depressed feeling, worthlessness, paranoid ideation, and self-referential thinking would interfere on the job and with public contacts." Tr. 455. She further stated that his ability to function or perform a normal work day would be "greatly impaired by his current symptoms." Tr. 456. Ms. McRuer-Wong further noted that Mr. Norris' "paranoid ideation would interfere on the job and with

public contacts." Tr. 454. She characterized Mr. Norris as "chronically mentally ill" and noted that he exhibited marked severity of social withdrawal. *Id.* The ALJ noted the fact—but failed to give credence to—Ms. McRuer-Wong's opinion that "symptoms of poor concentration and memory loss would affect his ability to learn and retain new information." *Id.*

Similarly, Ms. White noted that when Mr. Norris was in a bipolar state, it was extremely difficult for him to perform work tasks and maintain concentration, persistence, and pace. Tr. 497. She specifically recommended a "*part time*, flexible, low stress environment." Tr. 495 (emphasis added). The ALJ acknowledged that Ms. White rated Mr. Norris' impairment as "marked" or "extreme" in a number of work-related activities but discounted her opinion, finding that it conflicted with the other medical evidence of record and noting that she had a "very limited treating relationship with the claimant." Tr. 28. Specifically, the ALJ noted that Ms. White's opinion conflicted with the clinical assessment by Nurse Draper in November 2009 showing that Mr. Norris' condition was stable, and criticized Ms. White's "check box" psychological assessment. Tr. 28. The ALJ's focus on Nurse Draper's observations during Mr. Norris' mental "upswings" again failed to acknowledge the cyclical pattern of his biopolar condition. Moreover, the fact that Ms. White conducted a "check box evaluation" on Mr. Norris is not a valid reason to discredit her opinion, especially in light of the great weight the ALJ attributed to Dr. Mee's more cursory "check box" analysis. *See* Tr. 21, 435-48. Such reasoning indicates the ALJ's selective weighing of medical evidence relating solely to Mr. Norris' symptom-free periods.

As discussed above, the ALJ erred in rejecting Dr. Grubb's opinion because he did not provide legitimate reasons for rejecting it. *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010).

### 2. Residual Functional Capacity

Mr. Norris contends, and the Court agrees, that the ALJ erred in assessing his residual functional capacity. As discussed above, the ALJ improperly rejected the opinions of Dr. Grubb and incorrectly evaluated the opinions of Dr. Mee, Dr. Magelssen, Nurse Draper, Ms. McRuer-Wong, and Ms. White. In determining a claimant's residual functional capacity, an ALJ must assess all the relevant evidence, including medical reports and witnesses' descriptions of limitations. *See* 20 C.F.R. § 416.945(a). By improperly evaluating the medical evidence, the ALJ erred in assessing Mr. Norris' residual functional capacity.

### 3. Vocational Expert Hypothetical

The ALJ's error in assessing Mr. Norris' RFC also precluded an accurate analysis by the vocational expert (VE). Hypothetical questions that an ALJ poses to a VE to determine what work a claimant can perform "must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (quoting *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir. 1995)). The ALJ posed a hypothetical question to the VE that did not include all of Mr. Norris' limitations. The medical evidence indicates that Mr. Norris has limitations in his ability to respond to and tolerate the pressures of a normal work setting, and in maintaining appropriate contact with a supervisor. The ALJ's hypothetical, however, did not reflect these limitations. The VE testified that a claimant with these limitations would not be able to maintain employment. Tr. 595. Accordingly, the Court concludes that the ALJ erred by posing an incomplete hypothetical question to the VE and that this error was not harmless.

**B.      Lay Witness Testimony of Brenda Kerr Mino**

Mr. Norris contends that the ALJ erred in rejecting the lay witness testimony of Ms.

Mino, Mr. Norris' mother. The Court agrees. The ALJ rejected this testimony because (1) he found it inconsistent with other evidence in the record and (2) he found that Ms. Mino had a personal interest in Mr. Norris' financial independence. In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir. 1993)). When an ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ may discount that testimony by providing "reasons that are germane to each witness." *See Dodrill*, 12 F.3d at 919.

First, the ALJ erred in rejecting the lay witness testimony of Ms. Mino because her testimony was in fact consistent with other evidence on the record. Ms. Mino stated that Mr. Norris lived with her because he could not manage on his own, and that in his "down-cycles" he did not bathe, isolated himself, and slept a lot. Tr. 28. She further testified that she did not believe he could work given this trend. *Id*. This testimony is consistent with the opinions of Dr. Grubb, Ms. McRuer-Wong, Nurse Draper, and Dr. Magelssen. *See* Tr. 222-240, 414-431, 432-434, 453-56. The ALJ erred in concluding otherwise. Furthermore, the ALJ found that her testimony was unreliable because the depression episodes to which Ms. Mino referred did not last longer than 12 months. Tr. 28. As addressed above, the ALJ did not properly consider the totality of the medical evidence with regards to the 12 month durational requirement, thereby making his rejection of Ms. Mino's testimony likewise unsubstantiated on this basis.

The ALJ also found that Ms. Mino did not establish that Mr. Norris' tendencies to neglect bathing, respond to phone calls, do laundry, or other activities were linked to his bipolar disorder. *Id.* In support of this assertion, he pointed to the fact that Mr. Norris surfed the internet for hours and kept up with computer technology. *Id.* The ALJ failed to recognize that

Mr. Norris engaged in these activities only during periods of mental stability. He also failed to provide any evidence negating a causal link between Mr. Norris' depressive tendencies and his disorder.

The ALJ also erred in rejecting Ms. Mino's testimony by finding that she had a personal interest in Mr. Norris' financial independence. Tr. 28. Although the ALJ's reasons for doubting Ms. Mino's credibility were specific in that they related to her relationship with Mr. Norris, the ALJ provided no evidence to support his supposition regarding her financial motives. The broad rationalization that Ms. Mino was an "interested party" is not a legitimate reason for rejecting her testimony. *See Valentine*, 574 F.3d at 694 (finding that the ALJ erred in rejecting the testimony of claimant's wife on the sole basis that she was an interested party, without providing further evidence). The ALJ thus erred in rejecting Ms. Mino's testimony because he did not provide legitimate reasons.

**C.     Remand**

Where the ALJ has committed reversible error, this Court has the discretion to remand for further proceedings or to award benefits. *See Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). Mr. Norris asks the Court to remand for an award of benefits. Dkt. 15. He argues that had the ALJ adopted the limitations highlighted by Dr. Grubb and the other medical evidence, the ALJ would have been required to find him disabled. Dkt. 15. However, the Court finds that there are outstanding issues to be resolved before a determination of disability can be made. *See McCartey*, 298 F.3d at 1076 (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)).

If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. *McCartey*, 298 F.3d at 1076. Here, the ALJ did not properly weigh all of the medical evidence, nor did he substantiate his rejection of Ms. Mino's

lay witness testimony. Thus, the ALJ improperly assessed Mr. Norris' RFC, and the Vocational Expert did not properly consider the limitations of bipolar disorder in his determination of Mr. Norris' capacity to perform other substantial gainful work. Upon remand, the Commissioner must (1) reevaluate the medical evidence, including the opinions of Dr. Grubb; (2) reevaluate the lay testimony of Ms. Mino; and (3) reassess Mr. Norris' residual functional capacity.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's decision be **REVERSED** and the case be **REMANDED** for additional proceedings as set forth above. Objections, if any, to this Report and Recommendation must be filed and served no later than **August 19, 2011.** If no objections are filed, the matter will be ready for the Court's consideration on that date. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. Responses to objections must be filed no later than 14 days after being served with objections. Objections and responses shall not exceed twelve pages. The failure to timely object may affect your right to appeal. A proposed order accompanies this Report and Recommendation.

DATED this 5th day of August, 2011.

BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 16